UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-11661MLW

| | |
|---|---|
| MATTHEW WEYMOUTH<br>    Plaintiff, | : <br> : <br> : |
| v. | : <br> : <br> : |
| PENTUCKET REGIONAL SCHOOL DISTRICT;<br>PENTUCKET REGIONAL SCHOOL COMMITTEE;<br>MICHAEL J. MCLAUGHLIN, individually, and in his<br>capacity as Superintendent of Pentucket Regional School<br>District; JOHN PARKHURST, individually, and in his<br>capacity as Principal of Pentucket Regional High School;<br>ARLENE TOWNES, individually, and in her capacity as<br>Principal of Pentucket Regional High School;<br>DAVID MORSE, individually, and in his capacity as<br>Athletics  Director for Pentucket Regional High School;<br>STEVEN HAYDEN, individually, and in his capacity as a<br>Teacher and Coach at Pentucket Regional High School;<br>MICHAEL BIANCI; ADAM CHAPMAN;<br>SCOTT WILKES,<br>    Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

**MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS FEDERAL CLAIMS
BY DEFENDANTS PENTUCKET REGIONAL SCHOOL DISTRICT, PENTUCKET
REGIONAL SCHOOL COMMITTEE, MICHAEL J. MCLAUGHLIN, JOHN
PARKHURST, ARLENE TOWNES, DAVID MORSE AND STEVEN HAYDEN**

**STATEMENT OF THE CASE**

This is a suit for damages for alleged torts and civil rights violations brought against

five officials of the Pentucket Regional School District in their individual and official

capacities, the Pentucket Regional School District and the Pentucket Regional School

Committee.  The organizations are referred to hereafter as the "Pentucket Entities."  The

plaintiff's claims arise out of an alleged hazing incident on August 23, 2001 at a football camp

operated by Pentucket Regional High School ("Pentucket High").  This memorandum is in

support of a motion to dismiss all of the federal civil rights claims in the case, Counts I-VII.

Allowance of the motion would leave only state claims against the Pentucket entities, school

officials and the student defendants. A motion to dismiss certain of the state claims is filed

herewith.

## STATEMENT OF FACTS

For purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the factual

allegations in the Complaint are to be accepted as true. *Watterson v. Page,* 987 F.2d 1, 3 (1st

Cir. 1993).

In his complaint, plaintiff Matthew Weymouth alleges that he was required to attend a

football training camp operated by Pentucket High in order to qualify as a player on the team.

The camp was held at a facility known as Camp Marist in New Hampshire. Plaintiff

alleges that his mother, Lorraine Weymouth, communicated concerns that she had about

hazing to the Pentucket High Athletic Director, Defendant David Morse. Plaintiff alleges that

Morse assured Lorraine Weymouth that "nothing would happen to her son at camp."

Complaint ¶ 25. The plaintiff further alleges that at Morse's behest, several upperclassmen

told Weymouth that he need not worry about hazing at the camp. Complaint ¶ 26. Plaintiff

claims that in reliance on these assurances he attended the camp and was the victim of a hazing

incident on the second day of camp, August 23, 2001.

Plaintiff alleges that defendant Scott Wilkes "teabagged" him, by dragging his exposed

genitals across Weymouth's face as others held him down. Complaint ¶¶ 34-35. He further

alleges that defendant Michael Bianci attempted to insert a peeled banana into Weymouth's

rectum. Complaint ¶ 36. The claims against Adam Chapman are that he assisted Wilkes and

Bianci. Complaint ¶ 30-33.

Defendants Wilkes, Bianci and Chapman were students at the school at the time and not employees or agents of Pentucket High.

Plaintiff claims that the Pentucket Entities and school officials failed to enforce the state anti-hazing statute and their own anti-hazing policies and that such failures led to the incident in question.  Complaint ¶ 38.

Plaintiff alleges that the defendants' conduct has deprived him of rights guaranteed by the United States Constitution.  The Complaint thus asserts violations of 42 U.S.C. 1983 against the Pentucket school officials and entities at Counts I-VII.  Weymouth further alleges that the claimed assurance that nothing would happen to him at camp was negligence and a misrepresentation by the defendants Pentucket Regional School District, David Morse and Steven Hayden, actionable under the Massachusetts Tort Claims Act, M.G.L. c. 258.

## SUMMARY OF ARGUMENT

To prevail on his Fourteenth Amendment due process claims pursuant to 42 U.S.C. §1983, the plaintiff must demonstrate that the "state action" defendants deprived him of "life, liberty, or property, without due process of law."  The Due Process Clause of the United States Constitution does not place an affirmative obligation on the Pentucket Entities or school officials to protect students against harm at the hands of private third parties who are not acting under color of state law.

Moreover, in a Section 1983 civil rights case such as this one, government officials sued in their individual capacities are protected under the "qualified immunity" doctrine. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,*

457 U.S. 800, 102 S. Ct. 2727, 2738 (1982). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 105 S. Ct. 2806, 2815 (1985).

## ARGUMENT

I.    <u>STANDARD OF REVIEW</u>

"A complaint should not be dismissed for failure to state a claim unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Miranda v. Ponce Federal Bank,* 948 F.2d 41, 44 (1st Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957)).

II.    THE UNITED STATES CONSTITUTION'S GUARANTEE OF DUE PROCESS OF LAW DOES NOT REQUIRE SCHOOL OFFICIALS TO ENSURE THAT CITIZENS <u>DO NO HARM TO EACH OTHER.</u>

As a general matter, a state's failure to protect an individual from private violence, even in the face of a known danger, "does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The Due Process Clause, the Supreme Court has emphasized, is "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney,* 489 U.S. at 195, 109 S.Ct. 998. Thus, the Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or protect property interests of which the government itself may not deprive the individual." *Id*. at 196, 109 S.Ct. 998. *DeShaney* determined that the state was not constitutionally liable for the permanent brain damage to a child who was beaten severely by his father, notwithstanding evidence that the state was aware of the child's physical abuse and yet

failed to remove the child from his father's custody.  *See id.* at 202, 109 S.Ct. 998.

Cases in the First Circuit are in accord.  *See, Morgan v. Driscoll*, 2002 WL 15695 (D.Mass); *Willhauck v. Town of Mansfield*, 162 F.Supp.2d 127 (D. Mass. 2001)(Allegation that school officials violated civil rights of high school student violently attacked by fellow student with serious behavior disorder attending school at discretion of school authorities fails to state a claim under § 1983).

The Massachusetts Supreme Judicial Court came to the same conclusion in *Brum v. Town of Dartmouth,* 482 Mass. 684, 704 N.E. 2d 1147 (1999).  In that case Jason Robinson, a high school student, was stabbed to death by assailants in a school classroom.  Earlier on the day of the murder, the assailants had been at the high school and involved in a violent interaction with two of Robinson's classmates and possibly Robinson as well.  They left, but threatened to return to retaliate – information that was given to the school principal.  The assailants did return and went unimpeded to Robinson's classroom where the stabbing occurred.  The SJC followed *DeShaney*, holding that the school owed no duty under §1983 to protect Robinson and it ordered dismissal.

Just as the harm in *DeShaney, Buckley and Brum* occurred at the hands of a private third party, so too did the harm here.  It is undisputed that the plaintiff alleges that those performing the hazing were "private actors" who in no way can be said to have acted under color of state law.  Clearly, under *DeShaney*,  the Pentucket officials had no constitutional duty to enforce anti-hazing laws or regulations or otherwise protect Weymouth from the hazing by his fellow students unless some exception applies.

Although *DeShaney* made clear that the Due Process Clause does not generally impose an affirmative obligation on the state to provide the public with adequate protective services, it

did recognize that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *DeShaney*, 109 S. Ct. at 1004. One such circumstance, the court stated, arises when the state "takes a person into its custody and holds him there against his will." *Id*. at 199-200, 109 S.Ct. 998.  In addition to custody, the *DeShaney* court left open the possibility of constitutional liability when the state itself creates a dangerous situation or renders citizens more vulnerable to danger. *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998.  For the reasons discussed below, neither of these exceptions applies here.

> **A.** **There was no custodial "special relationship" that  constitutionally obligated  the school entities or their agents to prevent harm by private actors.**

The *DeShaney* court suggested that liability for constitutional harm might be found "when the State takes a person into its custody and holds him there against his will . . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its powers so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human need -- e.g., food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Id*.

To the extent that plaintiff argues that he was in a custodial situation due to his status as a student at Pentucket, his claim must fail.  Neither *DeShaney* nor any other Supreme Court opinion to date has suggested that public high school students are functionally in state custody.

Most federal circuit courts are in agreement.  As Judge Saris noted in *Willhauck, supra.,*

> "[A]lmost every federal court to have faced the issue has
> held that, because parents still maintain primary responsibility for
> the child, compulsory school attendance does not create the sort of
> special relationship that would trigger heightened protection under

the due process clause. *See D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1372 (3d Cir.1992) (en banc), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); *Doe v. Hillsboro Indep. Sch. Dist.,* 113 F.3d 1412, 1415 (5th Cir.1997) (en banc); *Doe v. Claiborne County,* 103 F.3d 495, 510 (6th Cir.1996); *J.O. v. Alton Cmty. Unit Sch. Dist. 11,* 909 F.2d 267, 272 (7th Cir.1990); *Dorothy J. v. Little Rock Sch. Dist.,* 7 F.3d 729, 732 (8th Cir.1993); *Maldonado v. Josey,* 975 F.2d 727, 731 (10th Cir.1992), *cert. denied,* 507 U.S. 914, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993); *Wyke v. Polk County Sch. Bd.,* 129 F.3d 560, 569 (11th Cir.1997). The Supreme Court, in dictum, has hinted that it would also reach a similar conclusion. *See Vernonia Sch. Dist. v. Acton,* 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) ("[W]e do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect' ....") (citing *DeShaney,* 489 U.S. at 200, 109 S.Ct. 998).

*Willhauck, supra.,* 164 F.Supp.2d at 133.

Massachusetts has also determined that school attendance is not a custodial situation (although the student was older than the mandatory school attendance age). *Brum v. Town of Dartmouth, supra.*

The First Circuit has yet to establish a firm rule on this point, expressing some reluctance to follow the rule without leaving room for exception. *Hasenfus v. LaJeunesse,* 175 F.3d 68, 72 (1st Cir. 1999). The *Hasenfus* court assumed that a school might in some circumstance owe a student a limited duty to protect. However, following *County of Sacramento v. Lewis,* 523 U.S.833, 118 S.Ct. 1708, 1717-19, 140 L.Ed. 2d 1043 (1998) the *Hasenfus* court held that a violation of such duty would "require pungent facts" and would need to approximate conduct "so extreme as to shock the conscience." *Id.*

In this case, the plaintiff cannot even allege that he was "in school" due to mandatory school attendance statutes in order to attempt to invoke the *DeShaney* state custody exception. The best offer that the complaint makes here is that <u>Camp Marist</u> was mandatory. Complaint ¶

15. In fact, Weymouth's attendance at Camp Marist was not even mandatory. He was certainly under no statutory attendance requirement since the school year had not yet begun. As the Complaint alleges at ¶ 15, attendance was mandatory only "for continuing and prospective members of the football team." The choice of whether to play football was his alone.

Moreover, plaintiff alleges in the complaint that he was aware of stories of hazing at Camp Marist, "as early as eighth grade," two years prior to the alleged incident. Complaint ¶ 16. He was free to elect not to play football or attend the camp in the first instance, or he could have returned to his home after the first night if he felt unsafe. See, *Monahan v. Dorchester Counseling Serv.* 961 F.2d 987, 990-993 (1st Cir. 1992)(No due process claim where the claimant voluntarily entered mental institution).

Even if the court were to find that the school defendants here owed plaintiff some constitutional duty due to the existence of a custodial context, the plaintiffs have failed to allege the "pungent facts" or conduct so extreme as to shock the conscience required under the *Hasenfus* court's view of a school-student relationship that might possibly create liability under §1983. (The shortcomings of the complaint under the "shocks-the-conscience" test are discussed more fully below.)

### B.    The "Pentucket Entities" and their officials did not create the danger or render Weymouth more vulnerable

Most federal circuit courts, including the First Circuit, have recognized the so-called "state-created danger" theory to justify the imposition of constitutional liability on state actors when harm has befallen an individual outside of the strictly custodial context. *See e.g., Dwares v. City of New York,* 985 F.2d 94, 98-99 (2d Cir.1993)(police encourage skinheads to beat up

flag-burning demonstrators*)*; *Ross v. United States,* 910 F.2d 1422, 1429-34 (7th

Cir.1990)(deliberate state interference with private rescue attempt).

In *Hasenfus,* the First Circuit considered the possibility that a "state created danger" was

alleged in a complaint that had been dismissed by the district court. In that case, it was alleged

that a gym teacher publicly reprimanded a 14-year-old student who, to the teacher's knowledge,

had been raped the previous year. The teacher then sent the girl alone to the locker room. It was

also alleged that the school was aware that seven other students in the school had attempted

suicide in the three prior months including two who were associates of Jamie Hasenfus. Jamie

Hasenfus attempted to hang herself in the locker room and suffered permanent injury as a result.

The *Hasenfus* court compared the facts before it with those of a Tenth Circuit decision, *Armijo*

*v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, (10th Cir. 1998), after concluding that *Armijo*, "if

sound . . ." is at the "outer limit" of generosity to plaintiffs. *Hasenfus*, 175 F.3d at 74.

In the *Armijo* case it was alleged that school officials sent home a 16-year-old special

education student for violent behavior at school. The student had earlier threatened to kill

himself. Contrary to school policy, the officials did not notify his parents that he had been sent

home where he had access to firearms -- a fact school officials were alleged to have known.

Alone at home, the student shot himself.

The Tenth Circuit held that *DeShaney* barred any affirmative duty to protect based on a

"custodial relationship" between student and school. *Armijo,* 159 F.3d at 1261-62. But, the

court also said that liability might be based on the school's affirmative act -- sending the student

home alone without informing his parents, contrary to school regulations -- if that increased the

danger to the child and also met the "shocks-the-conscience" test. *Id.* at 1262. The court said that

the latter test might be met if at trial the school officials were shown to have known that the child

in question had previously threatened suicide, was now distraught, was a special education pupil not fully able to care for himself, and had access at home to firearms. *Id.* at 1263-64.

The *Hasenfus* court determined that it was not even "remotely plausible" that the allegations of the complaint before it were sufficient to shock the conscience --even assuming the soundness of the *Armijo* standard. *Hasenfus,* 175 F.3d at 73-74.

As the *Hasenfus* court noted, the "shock the conscience" standard has been reserved for the egregious case such as in *Rogers v. City of Little Rock,* 152 F.3d 790 (8th Cir.1998) (rape by police officer in connection with car stop) and *Armstrong v. Squadrito,* 152 F.3d 564 (7th Cir.1998) (57-day unlawful detention).

In the present case, the only allegations that might be construed as "affirmative acts" that might "increase the harm" alleged in the Complaint are (a) the claim that Weymouth coach Steven Hayden strongly encouraged Weymouth to attend football camp. Complaint ¶ 21 and (b). the claim that Athletic Director David Morse "told upperclassmen on the football team to speak to Weymouth [about hazing]" (Complaint ¶ 25) coupled with the claim made in ¶ 41 that Morse's actions in informing upperclassmen of Weymouth's concerns caused Weymouth to be a target of the hazing. Even accepting as true that the school defendants had knowledge of prior hazing incidents as alleged, the conduct of a coach who did nothing more than provide some encouragement to a student to attend football camp could never be viewed as sufficiently extreme to shock anyone's conscience; nor could the act of trying to help the situation by soliciting assurances from upperclassmen.

No reasonable person could find that such conduct shocks the conscience even under the "outer limit" standard set by *Armijo.* The Pentucket school officials' conduct is probably less egregious than the conduct that the *Hasenfus* court found was not "remotely plausible" to view

as conscience shocking.  Accordingly, even if there was a custodial situation or affirmative

action on the part of the school entities or officials, the complaint fails to state a claim under

§1983 against either the Pentucket Entities or the individual school-employee defendants.

## C.     The individual defendants are entitled to dismissal

Plaintiff asserts claims against each of the school officials in their individual capacities as

well as their official capacities (Complaint caption).  None of the school officials can possibly be

liable to plaintiff violations of § 1983 on account of failure to prevent hazing or protect

Weymouth as they had no such duties in their personal capacities.   In addition, Morse and

Hayden are entitled to qualified immunity concerning giving allegedly false assurances and in

informing upperclassmen of Weymouth's concerns since government officials performing

discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

> a.      The claims of failure to prevent hazing and protect Weymouth fail to
> allege claims against anyone in an individual capacity.

The persons identified in the caption as being defendants in their individual as well as

official capacities are Michael J. McLaughlin, superintendent, John Parkhurst, principal in the

2000-2001 school year, Arlene Townes, principal from August 24, 2001 forward, David Morse,

athletic director and Steven Hayden, football coach.  All five are accused of failing to deter

hazing despite knowledge thereof.  Complaint ¶ 18.   Any constitutional duty to protect

Weymouth from injuries by third parties for a failure to deter hazing must stem from a "custodial

special relationship" with him.  As discussed above, there is no custodial relationship here.

However, should the court find to the contrary, these school officials could only have such a

relationship in their official capacities as administrators and employees of the school.  In their

personal capacities, they had no duty to enforce anti-hazing statutes or policies or to protect plaintiff. There is no duty to undertake such activities other than in an official capacity. Accordingly, these school officials cannot be held liable under § 1983 in their personal capacities for failing to protect Matthew Weymouth. See, *Morgan v. Driscoll*, Memorandum of Decision, Jan. 3, 2002, Zobel, D.J., 2002 WL 15695 (D. Mass), Attachment A. The allegations of failure to prevent hazing or protect Weymouth simply fail to allege any conduct other than that taken in an official capacity

### b.    The conduct of Morse and Hayden

The only remaining § 1983 claims against the school officials that might potentially be viewed as alleging claims in an individual capacity are those against David Morse alleging that false assurances of safety were given to Lorraine Weymouth and against Steven Hayden for allegedly informing upperclassmen of Weymouth's concerns about hazing that are said to have precipitated the hazing.

Even if the court decides that the conduct of Hayden and Morse was a potential violation of § 1983 because one of the two exceptions to the *DeShaney* rule applies, both defendants are entitled to qualified immunity since at the time of their conduct no reasonable person in the position of either would have realized that their conduct was in the context of a "custodial relationship" or that such conduct constituted a "state-created" danger.

The question of immunity is for the court to decide, even if it requires a factual determination as to whether the defendant acted reasonably under the circumstances. *Behrens v. Pelletier,* 516 U.S. 299,313 (1996). The court should rule on the issue of limited immunity at the earliest possible stage of the litigation, either on a motion to dismiss, a motion for judgment on the pleadings or a motion for summary judgment. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).

Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading a qualified immunity is entitled to dismissal before commencement of discovery. *Mitchell v Forsyth*, 472 U.S. 511, 526 (1985).

There are two prongs to qualified immunity analysis. *See, St. Hilaire v. Laconia,* 71 F.3d 20, 24 (1st Cir.1995). First, the court must determine, as a matter of law, whether the constitutional right in question was clearly established at the time of the alleged violation. *Id.* If the right was clearly established, the court must then ask whether a reasonable similarly situated officer "should have understood that the challenged conduct violated" that right. *Id.*

"Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer,* 468 U.S. 183, 193-95, 104 S.Ct. 3012, 3018-19, 82 L.Ed.2d 139 (1984). In *Davis,* the Court said that to deny immunity for violation of statutes without a constitutional dimension would "disrupt the balance between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Id.* at 195, 104 S.Ct. at 3019. S*ee also Borucki v. Ryan,* 827 F.2d 836, 847 n. 18 (1st Cir.1987). Here, the focus must be on whether in August, 2001 there was clearly settled law on the alleged constitutional violations.

This inquiry is sharpened by two narrowing principles. The right must be stated with sufficient particularity so that a " 'reasonable officer would understand that what he is doing violates that right' " and the right must have been "clearly established at the time of the defendants' alleged improper actions, and not through the use of hindsight." *Souza v. Pina,* 53 F.3d 423, 425 (1st Cir.1995) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). It is also important to recognize that the doctrine of qualified immunity "leaves ample room for [possibly] mistaken judgments and protects all but the plainly

incompetent or those who knowingly violate the law." *Bilida v. McCleod,* 211 F.2d 166, 174 (1st

Cir.2000) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 and 43 (1986) (internal quotation marks

omitted).

Here, as indicated above, virtually all of the federal circuits had decided that mandatory

school attendance was not a custodial setting for §1983 purposes. Even in the First Circuit, the

1999 *Hasenfus* decision would have told Hayden and Morse that there was no constitutional

violation in these circumstances without "pungent facts" that would "shock the conscience." For

the reasons discussed above, no reasonable person could have thought that their conduct

approached that standard.

Similarly, no one could argue that the conduct of encouraging membership on the team or

informing upperclassmen of Weymouth's concerns about hazing would have been recognized by

a reasonable person as constituting a "state-created danger" under the then-existing state of the

law.

There simply was no reason that either defendant should have recognized in 2001 that

"the contours of the right were sufficiently plain that a reasonably prudent state actor would have

realized not merely that his conduct might be wrong, but that it violated a particular

constitutional right." *Martinez v. Coloin,* 54 F.3d 980, 988 (1st Cir.1995).

Certainly, as of 2001 the "state-created danger theory" was well established generally and

in the First Circuit in particular. See, e.g., *Monahan v. Dorchester Counseling Ctr., Inc.,* supra.,

961 F.2d 987. Later judicial opinions have clarified the contours of this doctrine. Perhaps the

most relevant pronouncement within the First Circuit is *Willhauck v. Town of Mansfield,* 164

F.Supp.2d, 127(2001).

The *Willhauck* decision is dated September 5, 2001, so would not even have been published at the time of the alleged violative conduct by Hayden and Morse. Nevertheless, had they read it when they first learned some of what happened to Weymouth in late September 2001, there is no way that they could have objectively thought that telling a student's mother that he need not worry about hazing at football camp or telling upperclassmen to speak to him about whether or not there was a history of hazing at the camp served to create a danger through conduct "so extreme as to shock the conscience." This is particularly so inasmuch as the *Willhauck* case, in its discussion, compared *Graham v. Independent. Sch. Dist.* No I-89, 22 F3d 991, 994 (10th Cir. 1994) with *Canty v. Old Rochester Regional School Dist.* 54 F.Supp. 2d 66 (Mass. 1999). *Graham* held that a school does not create an unconstitutionally hazardous situation by placing known aggressors and the victim in the same location. In *Canty*, plaintiff alleged that her substantive due process rights were violated when she was forced to remain in school under supervision of an athletic coach who had allegedly raped her, when the school had knowledge of the specific act and of other sexual improprieties on the part of the coach. The *Canty* court found that such conduct is "truly outrageous, uncivilized, and intolerable," thus meeting the standard set by *Hasenfus*. The allegations in this case bear no resemblance to *Canty*, where the school officials had actual knowledge of a rape – not just by a third party, but by a school department employee over whom they had oversight responsibilities.

Moreover, in 1997, the New Hampshire District Court decided *Doe v Londonderry School District,* 970 F.Supp. 64 (1997) which held that there was no state-created danger when a coach spoke to perpetrators about alleged sexual harassment, allegedly leading to an increase in harassment activity. *Id.* at 76, precisely the claim asserted here.

For all of these reasons, the school employee defendants sued as individuals are entitled to limited immunity under § 1983.

## CONCLUSION

For all of the above reasons, the defendants Pentucket Regional School District Pentucket Regional School Committee, Michael J. McLaughlin, John Parkhurst, Arlene Townes, David Morse, and Steven Hayden demand that this court dismiss all of the federal civil rights claims against them in Counts I - VII on the grounds that the complaint fails to state a claim of any constitutional violation.  The individual defendants, John Parkhurst, Arlene Townes, David Morse and Steven Hayden further demand that all claims be dismissed against them either on the ground that the complaint fails to state a claim of a constitional violation against any of them in their individual capacities or, in the case of David Morse and Steven Hayden, on grounds that they are entitled to limited immunity.

Dated:  October ___, 2004                        Respectfully submitted,

                                                 Defendants,
                                                 **PENTUCKET REGIONAL et al.**
                                                 By their attorney,


                                                 _____
                                                 Gregg S. Blackburn, BBO# 044430
                                                 CASNER & EDWARDS, LLP
                                                 303 Congress Street
                                                 Boston, MA 02210
                                                 (617) 426-5900

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon:

**Counsel for Plaintiff:**

Peter C. Horstmann, Esq.
Partridge, Ankner & Horstmann, LLP
200 Berkeley Street, 16th Floor
Boston, MA 02116

**Counsel for Michael Bianci and Adam Chapman:**

Scott F. Gleason, Esq.
Melissa J. Lewandowski, Esq.
Gleason Law Offices. P.C.
163 Merrimack Street
Haverhill, MA 01830

**Counsel for Scott Wilkes:**

Vincent C. Manzi, Esq.
Charles S. Nierman, Esq.
Manzi & McCann
59 Jackson Street
Lawrence, MA 01840

**Co-Counsel for David Morse and Steven Hayden**

Bradley A. MacDonald, Esq.
Cummings, King and MacDonald
One Gateway Center
Suite 351
Newton, MA 02458-2802

counsel of record in this matter by **electronic filing (if applicable)** and **first-class mail** on
October __2/__, 2004.

_____
Gregg S. Blackburn